JACOB BLUMER and Another, Appellants, v. RICHARD N. DYER and Another, Respondents.

*Contracts — their construction determined by the situation and acts of the parties and the end sought.*

Where the language of an agreement does not fix a definite period within which one of the parties thereto has an option and right to purchase certain patents belonging to the other party, the court in determining the meaning of the language employed, which gives such party the option and right to purchase such patents for sixty days after the experimental plant had been "in successful operation," will take into consideration the situation of the parties, their conduct and the end sought to be secured.

APPEAL by the plaintiffs, Jacob Blumer and another, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 29th day of June, 1894, upon the decision of the court rendered at the New York Special Term dismissing the plaintiffs' complaint, and also from the decision of the court entered in said clerk's office on the 26th day of June, 1894.

*Geo. Hoadly*, for the appellants.

*Elihu Root* and *Edwin B. Smith*, for the respondents.

O'BRIEN, J.:

The appellants are patentees of inventions relating to the production of yeast from the waste products of starch manufacture. On the 17th of June, 1892, they entered into an agreement with the defendant the National Starch Manufacturing Company, which provided for the transfer of these patents to the defendant Dyer with a view to their ultimate acquisition by the starch company, if after experiment they were found to work satisfactorily.

By such agreement there was conferred on the defendant company the option to take an exclusive license under the patents in the United States, Canada and Mexico, and to purchase the same upon certain considerations, which included, among others, the payment of $2,500, and the furnishing of suitable buildings with machinery and apparatus, according to the working plans to be furnished by plain-

tiffs, " for the experimental manufacturing of yeast by the processes covered by said patents in order to determine the availability of the said processes for utilizing in the manufacture of yeast the waste product of its (the starch company's) present processes of manufacturing starch, and the commercial availability of the said inventions and processes for the purposes of its business." The agreement provided that such option and right to purchase should continue " until the expiration of the period of sixty days from the time when the said experimental plant is in successful operation, and producing yeast by the processes described in the said patents in sufficient quantity to enable the starch company to put the same upon the market and test its commercial availability." The starch company agreed that it would endeavor to " utilize the entire waste product of starch-bearing materials of its factories in the manufacture of yeast under the patents." The agreement further provided that the patentees were to devote their time and attention to erecting and operating the buildings, etc., and use their best. efforts to " put such experimental plant into successful operation as soon as practicable."

The purpose of this action is to procure a judgment adjudging said contract to have been terminated and no longer binding, and that the patents be returned to the plaintiffs. The question presented is one involving the construction of this agreement of June 17, 1892, and as correctly stated by the learned trial judge : " The struggle in this action arises upon the claim of the plaintiffs, that the option was not exercised within sixty days, as provided for by the contract, which claim is resisted by the effort of the Starch Company to show full compliance, either actual or tendered, and strict conformity with the contract ; and the main question, therefore, to be solved is the actual date when the somewhat indefinite period, from which the time began to run, really occurred. When was the ' said experimental plant in successful operation ? ' "

The defendant company was among the largest manufacturers of starch in the United States, and in that connection was in possession of a number of factories. The plaintiffs are chemists, and prior to entering into the agreement with the defendants had been employed in the manufacture of yeast, and had obtained at the date of the contract " two letters patent of the United States for improvement in the manufacture of yeast, the substance of said inventions

being that they embraced a method of making yeast out of the steep water or waste water used in the manufacture of starch, and which, before the date of such invention, had been wasted and thrown away." Their invention was thus characterized in a communication to the starch company in March, 1892 : "Blumer and Schlagenhaufer's method of utilizing waste products. Our invention has for its purpose to open a new and profitable field to the starch industry, by utilizing certain liquid waste products which heretofore were of little value."

The character of the inventions, the purpose to be served, the results to be accomplished, the letters and conduct of the parties, are all important as bearing upon the question of when the time within which the defendant starch company was to exercise its option commenced to run. The language of the agreement did not fix a definite period, and it is in the light of the situation of the parties, their conduct and the end to be secured, that we are to determine the meaning of the language employed which gave to the starch company the option and right to purchase for sixty days after the experimental plant was "in successful operation."

"It is a cardinal rule in the construction of contracts that the intention of the parties is to be inquired into and if not forbidden by law is to be effectuated; and whenever the language used is susceptible of more than one interpretation, the courts will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties and the subject-matter of the instrument." (*French* v. *Carhart*, 1 N. Y. 102. See, also, *Coleman* v. *Beach*, 97 id. 553, 554; *Heath* v. *Hewitt*, 127 id. 174.)

It is insisted by the appellants that the construction given to the contract by the court below was erroneous in this — that it treated the plaintiffs as guarantors for the manufacture of first-class starch by the factory, while, at the same time, the experimental plant was required to prove a success in making yeast. We have examined the argument by which such contention is sought to be supported, and fail to see that it in any way militates against the force of the findings made on sufficient evidence and supported by the opinion of the trial judge. We might be well content to rest this appeal upon that opinion, because supplementing it is a mere work of supererogation, every question that could be presented having been

disposed of in the numerous findings of fact, and the conclusions of law and the grounds or reasons therefor clearly and forcibly stated in the opinion. The importance of the question, the value of the interests involved, and the ability and earnestness with which the appellants have pressed their construction of the contract upon our consideration necessitated an examination of the voluminous record in the light of the arguments ; but, as already said, the question in the main narrows itself down to a very simple issue, determinable upon the solution of the question whether it was the intention of the parties to enter into a contract for the successful manufacture of yeast as an independent product, or of the successful manufacture of starch and the successful manufacture of yeast as a by-product thereof.

When we recall the scope of the inventions which was " to open a new and profitable field to the starch industry, by utilizing certain liquid waste products," and that the buildings and machinery were to be furnished by the starch company " for the experimental manufacturing of yeast by the processes covered by said patents in order to determine the availability of the said processes for utilizing in the manufacture of yeast the waste product of its present processes of manufacturing starch," we have a guide to what the plaintiffs themselves claim as the advantages of their patents and a key to what the starch company expected to achieve ; and these, with the correspondence spread upon the record and the character of the experiments carried out by the plaintiffs, are an unerring index as to the intention of the parties. In other words, in order to determine when the experimental plant was in successful operation, it is necessary to ascertain what the experiment was, to try which the plant was erected. Undoubtedly it was, in effect, to ascertain whether the profitable manufacture of yeast by the plaintiffs' processes could be combined with the profitable manufacture of starch by the defendants' processes. Both regarded yeast solely as a by-product of the starch manufacture, and did not intend or seek to determine anything as to the independent manufacture of yeast. And the conclusion reached by the learned trial judge, that the experimental plant was not in successful operation until the experiments to try which it was constructed were successful, that is, when the successful manufacture of yeast was combined with the successful manu-

facture of starch, is amply supported. But the question then remains, when with reference to date was this ascertained?

It is conceded that the starch company complied with the preliminary conditions by paying the amount fixed, and, after obtaining the necessary working plans and specifications, furnished a suitable building and equipped the same with proper machinery and apparatus for the experimental manufacture of yeast by the processes covered by the patents at the city of Indianapolis. And while it may be true that on November 3, 1892, the experimental plant was in successful operation and producing yeast by processes introduced by the plaintiffs, we think it equally apparent that the plant was never brought into successful operation and never produced yeast by the processes described in the patents, but that all the operations were experimental in character and consisted of modifications and variations of the processes described in the letters patent and of the material to which they were applied, and that the yeast produced by the plant was made by processes in some respects different from those described in the patents, and that the evidence shows that " thereafter continuously and until long after the third day of November, 1892, a course of extensive and protracted experiments was carried on at said plant in Indianapolis by both parties working together to that end until the desired result was finally approximated and shown to be practicable and likely to be commercially successful; but this was not ascertained or apparent until about the 1st of January, 1893, when it became apparent that the plaintiffs' said inventions could be made useful and profitable in the prosecution of this defendant's business." If, therefore, the contract contemplated the production solely of yeast, without reference to the production of starch, then the plaintiffs' position would be right; but, if it was contemplated and intended to apply the processes to the successful manufacture of both products, yeast and starch, then clearly the defendant is right; and thus, as already stated, the difference in the contentions urged consists in one affirming and the other denying the interdependent relation between the successful manufacture of starch and yeast.

Prior to the making of the contract, the plaintiffs submitted to the defendant company a written statement of what they could do, which commenced with the declaration that " our invention has for

its purpose to open a new and profitable field to the starch industry by utilizing certain liquid waste products," and referred to " corn, the principal raw material for the manufacture of starch," as containing certain substances soluble in water which can be separated; and how they could be separated is thus stated : " The separation is made in such a way and at such a low temperature that the starch does not undergo any changes, but stays intact and may serve the purposes of starch manufacture in any of the usual methods. What we use is only the soluble part of the corn, which now goes to waste as wash water; and the operation which is necessary to obtain these soluble parts in a suitable extract does not change the present course of making starch in the least, and does not decrease the value of the feed which is a result of the starch industry. \* \* \* The American starch industry is in a position to produce about eighteen millions lbs. of yeast per annum, and is able to monopolize the entire yeast trade of the United States, as it is absolutely impossible for anybody to compete with it if our process is connected with the manufacture of starch." In what is termed their report of June 6, 1892, plaintiffs state that the method of making yeast can be connected with " your present mode of manufacturing starch without any difficulty and with entire success. The results obtained as per quality and quantity of yeast are highly favorable. In our opinion, you will have two ways to introduce and carry out our process : (1) In using steep water with sulphurous acid. (2) Extracting ground corn." The plaintiffs proceeded to say that the *first* of these methods would be " the easiest manner to introduce our process without making any changes in your manufacturing." And the report concluded with a request that the starch company should " take into consideration in near future our projects which we made to you some time ago, in order to come to a practical agreement."

These extracts state what the plaintiffs proposed to do, and are in no way suggestive that the proposition was one for the manufacture solely of yeast, or one which should transform the defendant's business from the making of starch into the manufacture of yeast, but clearly indicated that in connection with the starch business they offered a valuable adjunct in the shape of the processes which would be equally successful in producing good yeast from the steep water used in the manufacture of starch, and which otherwise would

run to waste. That the plaintiffs had experimented in this direction appears, but that the plan had been brought into successful operation prior to the making of the contract is negatived by the terms thereof, which provided not only for an examination into the validity of the patents, but for the expending by the defendant company of considerable money in furnishing a building properly equipped "for the experimental manufacturing of yeast by the processes covered by said patents." We think, therefore, that the defendant company is correct in asserting that "when the agreement was executed neither party imagined that the Company would sacrifice or subordinate this business to, or allow it to be injuriously affected by, the manufacture of yeast from its waste water." The claim that the two processes of making starch and yeast were to be entirely independent, and that the purpose of the erection of the plant and of the experiments undertaken was to determine whether or not the plaintiffs could make good yeast, has not the slightest basis for support. While, therefore, the experimental plant was erected with a view of determining whether yeast could be produced by the patented processes in quantities sufficient to test "its commercial availability," it was also for the purpose of testing "the successful operation of the experimental plant;" and by this undoubtedly was intended the harmonizing of the two products in such a way that, without interfering with or subordinating the starch business, the making of yeast could be successfully accomplished.

That this is so is further apparent from other language in the agreement, reciting the object and purpose for which the building and machinery were to be furnished, which are stated to be "in order to determine the availability of the said processes for utilizing in the manufacture of yeast the waste product of its present processes of manufacturing starch, and the commercial availability of the said inventions and processes for the purposes of its business." To destroy the force of such language it is insisted that this is but a recital and not a contractual provision. But it shows what the purpose and object of the parties were, and is properly resorted to where, as here, a dispute has arisen as to the meaning of the contractual language used in order to ascertain the intent of the parties.

In addition, however, to language oral and written, which we find throughout the record expressive of such intent, we have the conduct of the parties, which always may be resorted to for the purpose of determining what construction they themselves placed upon the contract. Without repeating specific acts we think it clearly appears that the effort of the plaintiffs and the defendant company was directed towards the successful production, not only of yeast, but also of starch; and while it may be conceded that, with some modification, yeast could be produced, and that this fact was established by November third, it is equally clear that subsequent to that period the efforts of the plaintiffs were not relaxed, but that they struggled continuously to obtain good starch down to and until January, 1893, when for the first time was established, in the language of the contract, "the availability of the said processes for utilizing in the manufacture of yeast the waste product. of its present processes of manufacturing starch." And then for the first time were successfully determined the experiments for which the experimental plant had been constructed, and on such data alone do we think it can be held that there was a "successful operation" of such experimental plant.

The claim that plaintiffs remained at Indianapolis and assisted in bringing about the manufacture of starch of a suitable quality between November, 1892, after they had determined that by their processes yeast could be produced, and January first, when it was ascertained that both products could be successfully obtained, the one the by-product of the other, merely to assist the defendant company, is neither frank nor candid. On their representation of what could be accomplished the defendant company went to considerable expense and did what was required of it and what lay in its power to enable plaintiffs to verify their statements, and plaintiffs were not only in honor and fair dealing bound, but, as we have shown, by the fair construction to be given to the contract, they were bound to make such representations good. And that they understood this is more consistent with what they did than any explanation based upon a statement that they were gratuitously engaged in assisting the company out of its difficulty. It is clear that so far as the starch company was concerned, as there was no intention to give up their business and enter exclusively upon the

manufacture of yeast, the patents would have been of little value to it; and yet, upon the plaintiffs' theory, we are to assume that it deliberately entered into an agreement by which it subordinated its principal business to enter upon an experiment, to demonstrate the success of which, it was, in addition, willing to expend time and money.

There is but one other argument, to which a brief reference should be made. It is claimed that when the learned judge decided that the manufacture of yeast out of waste steep water was not one of the " present processes " of the defendant company contemplated in the making of the contract, and that the experimental plant would not be in successful operation unless the factory could make high-grade starch with the same steep water out of which plaintiffs were to make first-class yeast, and that yeast could not be made out of whole corn steep water, he found that the parties entered into what at the beginning would have been an impossible contract. The plaintiffs had notified the defendant company of the two ways in which their patented processes could be introduced; and, while it is true that the process of manufacturing starch by the use of acidulated water, or water saturated with sulphurous acid gas, was being tried or considered experimentally, the uncontradicted evidence is, that when the contract was made, this way of making starch was not one of the starch company's then " present processes." The most that in this respect can be claimed is, that it was one of the means by which the plaintiffs proposed to make the steep water of starch manufacture available for yeast manufacture; and that the experiment could not be successful so long as this method of treating the steep water injured the starch. While, therefore, it is true, strictly speaking, to say that that method of making starch was not one of the then present processes in use or intended to be used, it was a process in connection with which experiments had been made by the defendant company, assisted by the plaintiffs, and was in contemplation by the parties as a possible solution of what was desired, namely, the successful manufacture of the two products.

It will thus be seen that in steps more circuitous we have reached the same conclusion more directly reached by the learned trial judge, that the intention of the parties was to enter into a contract for the manufacture of yeast as a by-product of starch, and to that end the

FIRST DEPARTMENT, JANUARY TERM, 1895.          [Vol. 84.

experimental plant was constructed, which never could be regarded as having been successful in its operation until it could produce the yeast without injury to the starch.    This conclusion is the result of a fair construction of the language of the agreement itself, which, so far as doubtful, is made plain and clear by the light afforded by the communications, both verbal and written, of the parties, and their own acts, which, we think, place their intent and meaning beyond reasonable doubt.

The judgment should be affirmed, with costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment affirmed, with costs.